Morning, Your Honors. Carl Gunn, appearing for Mr. Reodica. I have to work on it myself also. I'm going to try to reserve three minutes for rebuttal, and I'll do my best to keep track of my time. And unless the Court wants to direct me elsewhere, and of course feel free to do that, I'll start with the two sentencing issues. There are two that remain contested. Restitution is now uncontested. The first is the reliance on improper factors to deny acceptance of responsibility. And the second is making a finding of loss caused by the fraud based solely on the bankruptcy claim. I'll start with the second of those, unless again the Court wants to direct me somewhere else. The problem here, what's striking, is the government and the Court completely brushed past the question of causation. The evidence of loss which was presented for sentencing was simply the loss in the bankruptcy. What was not presented was how much of the loan was a result of the fraud that was therefore lost in the bankruptcy, or whether the bankruptcy was caused by the fraud. The defense made a very strong argument that this was basically a small business that grew too fast, and that was the reason for the bankruptcy. Can I just jump in and ask? Please. I have a very hazy grasp of how the loss all played out. But would a viable theory here be simply that early on in this lending relationship, I don't know exactly when your client started falsifying or submitting fraudulent documents to the bank, but is a theory that early on had the truth been revealed to us, we would have cut off our lending relationship altogether with this guy, and therefore whatever was outstanding from the time the fraud started until the bankruptcy, all of that, all of those losses are in fact attributable to his fraudulent scheme because we would never have had any outstanding loans with him to begin with. We never would have loaned anything but for the fraud. If there had been evidence of that, and I've got to be clear here, I'm not saying it would be impossible to make a finding. What I'm saying is there needs to be a remand for the finding to be made because there was no evidence presented. If there was evidence presented showing what your Honor just described, yes. If there was evidence presented showing that the bankruptcy happened only because, yes. But that evidence was not presented at the sentencing hearing and not found by the judge. All that was looked at at the sentencing hearing was the loss in the bankruptcy, and the defense argued very directly that the bankruptcy would have happened anyway. And there was never any evidence that there would have been no loans at all but for the fraud. Well, I mean, I don't know. I guess it seems to me a fair inference that a bank, you know, that's extending. Well, actually, if you look, the only specific evidence about the fraud that was presented for sentencing purposes was basically what he pled to. What he pled to was one type of fraud in April of 87, and I forget whether it was the double pledging or the forged contracts. There were several versions. And then several types of fraud, I think, starting in spring of 88. So I think a fair inference from just that is that some of these loans would have happened anyway, and some wouldn't have happened. But, okay, what I couldn't get a grasp of is, like, when did this fraud start in terms of what your client pleaded guilty to? There was never any evidence of that presented at the sentencing hearing, with the government sentencing pleadings. So we don't know how much of the outstanding loans at the time of the bankruptcy could, like, we don't know when. Correct. And in particular, the language I quote from the cases talks about a sentence being unreasonable, either procedurally or substantively, different courts put in different boxes, if the court relies on a finding that's without support in the record. And there was no support in the record for a finding of causation here. Okay. Well, then, if that, if the imperial loss is not sustainable on its own, let's say, which I think is the government's main position, but isn't it nonetheless clear that the loss exceeded $5 million by a pretty significant amount? Even if we can't peg the exact dollar it got to, it was well in excess of that. You mean the loss that was caused by the fraud? Overall loss is not just to imperial, but to the other lenders. There really isn't. If you total all the government relied on at sentencing and presented at sentencing was the total loss in the bankruptcy, which has nothing to do with causation, or at least there was no evidence tying it to causation, and then the specific counts in the indictment. I think I add up in my brief the specific counts in the indictment. They add up to some tens of thousands of dollars, not millions. So I don't think the judge, first of all, the judge didn't make a finding of causation, and second of all, I don't think there was enough for him to make a finding of causation. Now, maybe that could happen on remand. I'm not arguing that the court's not entitled to have a hearing on remand and let the government present evidence, but it wasn't presented here. That whole question of causation got sort of overlooked. There was this idea that the bankruptcy was the fraud. I'm worried about that when I read the briefs, but it's usually something that occurs in my limited experience in sentencing. It's usually something that's discussed and an objection is made to sentencing and the judge works it out there. Was there any objection made by your client on this particular issue to the district judge so that it was specifically before the judge? There was, Your Honor. First of all, the pre-sentence report specifically raised that doubt by saying we have concerns that there's not causation of the whole bankruptcy fraud here. Pre-sentence report? Yes. And in the defense sentencing memorandum, which is in the excerpt of record, the defense strongly argued, and it cited the sentencing commission's primer. It's called on loss. It directly argued that there was no showing of causation tying the bankruptcy loss to the fraud. And then when this was apparently raised, as you said, did the judge, did the district judge make any comment on it? The judge simply found there was a loss relying on the government's totals from the bankruptcy. And so the judge never addressed the specific issue you have, that you just can't rely on the bankruptcy court. You have to find out the actual facts, which you believe are much less than the very large amount that was determined and based upon which the judge made a ruling. The judge simply said, I find loss. Yeah, I guess that's correct, Your Honor, implicitly. The judge simply said, I'm finding loss based on the government's evidence that was submitted about the bankruptcy. I guess it's before us then. Thank you. There is also the acceptance of responsibility question, which, again, I think requires remand. We're not saying the district court would have to grant acceptance of responsibility. The district court listed three factors as the basis for its denial of acceptance of responsibility. One of those, of course, was the motion to withdraw the plea, which we concede could be considered. But then he specifically, and the first two things, actually, that he listed were these. First, the fact that the plea was entered, quote, only after the court had dedicated its resources to trying what appeared to be a very complicated and long trial, unquote. Second, quote, he relied on, quote, he put the government, Mr. Iotica, to the task of preparing the case, unquote. Those lie right in the face of what this court has said a court can consider in denying acceptance of responsibility. You can't hold a defendant's exercise of constitutional rights against him as an affirmative factor. And you can't — I mean, this isn't even exercising the rights. It's not giving them up until the last day. And the effect that has, it's not just the timeliness. I agree that he might have doubts about the sincerity of acceptance based on last-minuteness. But he didn't just refer to last-minuteness. He referred to making the government work and making the court work. And we'll draw on his guilty plea. What's our standard of review? It's de novo. It's clearly erroneous, but de novo where the district court makes an error of law. And here there was an error of law. I'm sorry. On de novo review, we can look at the entire record, correct, to determine whether or not as a matter of law, the district court erred in denying acceptance of responsibility? I'm sorry. I'm not arguing that the district court erred as a matter of law in denying acceptance. I'm arguing the district court erred as a matter of law and relying on the fact that the defendant made it prepare and made the government prepare. Okay. So if we take away those two. Then I don't think you can then say, well, even then the court could have or would have. I guess there's, I mean, I don't, I suppose you could go to harmless error, though I don't know if the government's really argued harmless error. Can we consider the fact that he fled? Well, the district court could. I don't think this court can do that balancing itself. On de novo review, we couldn't? No. I think all that the de novo review is, was it an improper factor to consider? If it was an improper factor to consider, then it gets remanded with directions that the district court redo the balancing without that improper factor. I don't think this court sets the improper factor aside and does the balancing itself. That's the district court's job. So what case says that when we're reviewing the district court's decision whether or not to give credit for acceptance of responsibility, we, our only option is to remand it? Well, I think. What case says that? I think basically virtually all the cases I cite in my. Give me your strongest case for the proposition. I can't tell you which one is strongest, Your Honor, but I will give you four or so cases. I don't want four. I want your best case for that proposition. I can't tell you which one's best, Your Honor. Well, just pick one that you think says that, then. I frankly don't remember which. Right. The cases that do that, the cases that remand for reconsideration. Well, that's not, but that's not the question I ask you. The question I ask you is what case supports the proposition that in reviewing the district court's decision to deny acceptance of responsibility, that our only recourse is to remand it to the court for reweighing? The case that supports that proposition, Your Honor, is Cortez as one of several. Now, it may not expressly state that, which might be what Your Honor is actually asking. But all the cases, Cortez, Sitton, McKinney, Vance, all those cases, what they do, Your Honor, and so they implicitly hold what Your Honor is asking, if not expressly, and they may say it expressly, I don't recall. They all say, no, they don't do the balancing themselves without the factor. They remand for the district court to redo it and reconsider it. And, of course, here I'm arguing that there should be a remand to a different district judge. But that's a separate consideration. Now, I've got three minutes left. Well, I want you to show me the language in Cortez that you're, when you come back, you can tell me the language in Cortez that you're relying upon to guide our review. Okay. I may switch to another one. I may simply tell Your Honors it's not expressed language, but I'll look. Right. Okay. And I'm going to try to pay attention to the Postal Council also. Thank you. Thank you. Good morning. May it please the Court, Ruth Pinkel for the United States from the Central District of California. Your Honor, Your Honors, I think it's important to realize that the district court had presided over this case for several years with lots of motion practice, with lots of evidence presented to the court about defendant's conduct. The attorney who represented the defendant in sentencing had come into the case just a few months before, had not been involved during this extensive motion practice, and so would not have, and so the government and the court didn't just brush by his argument that there was no causation. There was ample evidence in the record to show the defendant was the leader of a very extensive, years-long scheme to defraud that was essentially a Ponzi scheme with fancy window dressing, and the window dressing being five separate companies, 28 locations throughout California. Do you agree with opposing counsel that there really wasn't the kind of evidence that would support the view that, well, hey, basically, they would have cut off the lending relationship way back when, and so therefore it is reasonable to assume that all of the losses that they were left stuck holding the bag for are directly attributable to the fraud. Your opponent says, well, no, you guys never put on evidence that would make out that showing. Well, there was actually, and if the court looks in the record, the government excerpts of record between 156 and 212, there are motions in lemonade, both defense and government, and many pages of FBI interview reports with the CFO, Bruce Lee, who would let you think about it. Say the pages again. It's 156 to 212 in the government's excerpt of record, and then also you can hear the motion in lemonade argument, which begins at government excerpts of record of 214, which was the Friday before defendant pled guilty, and there's extensive evidence about how this business was permeated by fraud in so many different complex ways, and so many different banks were defrauded. There, either there were, sorry, it's sort of complex. There's probably seven or eight different ways that the business was permeated by fraud, and so that evidence was in the record for the court. Okay. Well, hang on one second. I guess I started out by asking about the loss to Imperial specifically, right? Certainly. Because that's ultimately what the district court pegged the number to? Correct. So, again, that's in the motion in lemonade hearing. Imperial had bought a huge portfolio of loans approximately the year before. Many of them, I think, had come from Union Bank, which also had been defrauded. Imperial started to realize in the spring and early summer of 1988 just how extensive the fraud was. And executives from Imperial, and this is in these declarations and in the FBI reports, Imperial executives come from San Diego, meet with the defendant, meet with his CFO, and start questioning him and auditing because they're afraid there's fraud. They actually only discovered at that time a small portion. Defendant then, through the month of June and July, he tries to work out a deal with Imperial. Imperial enters into a new contract with him, I believe July 25th. Bankruptcies filed August 4th. Defendant leaves about July 28th. This is in 1988. So Imperial was aware of the fraud. They were trying to work out a deal with the defendant. And then, ultimately, he couldn't. They started calling in the loan, and his businesses collapsed. So this all happened in a very compressed time frame between the end of June and early August. So before he left town, he hired an attorney to file for bankruptcy. So this was late July because Imperial was calling in the loan. At that point, they were owed about $171 million. And then the companies collapsed in bankruptcy. But they collapsed in bankruptcy because Imperial was concerned about the overwhelming fraud and was calling in the loan. So the causation, the evidence of the causation, is in the record. It's just that it's the court had presided over such an extensive period of time in this case that that evidence was there. I did not point back to that specific evidence. I made the arguments about the fraud at the sentence. Roberts. Why then did the PSR basically just say, look, this is just too weird. Nobody is ever going to figure this out. It doesn't sound like it was nearly as clear as what you just painted. Well, it was. And that was surprising. We tried to work this out and filed our objections to the PSR, you know, the original PSR. We had given the bankruptcy trustee 13,000 pages of claims data and the summary spreadsheets from the bankruptcy court. My agent and I went to the National Archives and got all of these records. And the evidence was there. And there were summary charts showing the individual investor claims, the bank claims when the trustee agreed to them, the support for the individual investors. And we have a representative sampling in the record. But the individual investor claims, for example, would be supported by a stock certificate mostly signed by the defendant. And then with support, and this is what these people filed in the bankruptcy after the defendant fled, they would have copies of their checks that they wrote and the stock certificate with the same amount of money signed by the defendant. Why the probation office didn't go into that, I don't know. But we definitely, we objected. We called them. We emailed them. They said, just file your objections. We're not going to speak to you about it. This is after the pre-sentence report came out, and you objected to the pre-sentence report on the basis of their challenge that there was insufficient connection. Exactly. And the district court agreed with the government. Was that discussed during the sentencing, the objection? The objection? I'm sure it was, and I think I know that I said both in writing and at the hearing, I'm pretty sure that I said, I mentioned again, that we had gotten 13,000 pages of claims data from the bankruptcy court from the National Archives because that was significant. We have to have a connection here because we're charging the person. I don't have any sympathy for this defendant, but we do have to follow the rules that we have. And how did the district court agree with the government? On what basis did the district court find that there was a connection to this entire group of bankruptcy cases to show the issue and that the pre-sentence report was wrong? Well, the court, as I said, I cited all the documentation submitted with the motions in Lemonet, and the court had reviewed all of that information. And part of that had to do with, well, the court reviewed all the information and made necessary determinations about how the fraud had occurred and defendants' role in that fraud in making certain rulings as to evidence that the government could introduce. And so the court already had that information, and the court reviewed what were essentially summary charts that the government submitted, both the probation a year before and then at sentencing, which had the spreadsheets, and I believe there's at least 18 pages worth of spreadsheets, which summarized the documentation from the bankruptcy court about both the bank fraud claims, or excuse me, the bank claims and the individual investor claims. Let me see if I understand correctly. The district court had at that time a spreadsheet that referred back to specific records that the government had produced to justify the amount. Yes, Your Honor. And that was submitted, I believe, with the government's objection, but perhaps with the government's sentencing position. So the spreadsheet was there, a representative sampling of what the individual investor claims looked like, as well as court orders from the bankruptcy case, and specifically because it was trying to streamline it, the government submitted a court order for the bankruptcy finding the imperial loss after the settlement to imperial from $67 million to $33.5 million. In addition to that, we had the claim from the FDIC, which had taken over from the RTC because this case is so old, and the FDIC's claim was essentially a spreadsheet that set forth how much imperial, so this is FDIC as a receiver for imperial, how much imperial was owed at the time of the bankruptcy, and then various amounts that had been reduced from that, and frankly were probably more generous to the defendant because it was reduced for things that happened after the crime. But in any event, just as a conservatively, we went with a $33.5 million. It could have been much, much higher. Did I hear you say earlier that you think there is a basis in the record to conclude that the bankruptcy itself was directly attributable to the fraud? Absolutely, absolutely. Okay, why? I'm sorry. I was just going to ask why. If you look between, in the government excerpts of record between 156 and 212, you will see the motions in limine and the supporting declarations that were filed by an imperial bank executive back in 1988, and I'm not sure which litigation that was filed in. There was a lot of civil litigation. And then you will also see the interview reports with both that individual, his name is Frank Mercer, who is the executive from Imperial, about his confrontations with the defendant and with the CFO, Bruce Lee, their confessions of the fraud. And I guess prior to that, Imperial's determination in the spring of 1988 and summer that there was massive fraud, and that's why they came from San Diego up to Los Angeles to look at the books and audit. They confronted Bruce Lee and the defendant. They confessed to some of the crime, not all of it, and then Imperial pretty much stayed there and met with them over the next three to four weeks to try to work something out. An additional contract with defendants and his companies, and it was signed by a defendant personally, was entered into I think approximately July 25th of 1988, and that was the point at which the defendant decided to file for bankruptcy. And he hired Elwood Louie, and we have portions of, again, Justice Louie's depositions in the record in this case. You described the business as essentially collapsing at that particular point. Correct. So what was the triggering event that caused the collapse? Imperial realized how massive the fraud was with how the Grand Realtor group of companies was operating under the Imperial line of credit, which at that point was about $171 million, and started making some changes as to how any money was collected from borrowers, because Grand Realtor was servicing loans on behalf of Imperial, car loans, among other things, and using that money to front payments to make it look like the customers were paying. So Imperial was imposing lots of different requirements because they actually wanted to call in the loan, but over late June, early July, tried to work out requirements with Grand Wilshire and then got the defendant to execute another agreement, and then I can't remember the details, but Imperial decided to call in the loan. The entire line of credit, and Grand Wilshire was collapsing. And you will also see in those interview reports, in the interview with Bruce Lee, he will say the scheme had been going on probably at least since 1984, and the indictment does charge conduct starting in 1984, so about 1984 to 1988, depending on the financial institution. But what Bruce Lee said, and this is sort of a significant fact, is that at the time of the collapse, Grand Wilshire Group of Companies were fronting approximately $4 million a month in car loans for their customers who were in default, which is a significant material fact for both bank fraud and false statements to financial institutions, but also in terms of its ability to keep going in business. Okay. So you're almost out of time, but can I ask you about the acceptance issue? Yes, absolutely. I think counsel, your opponent here, is absolutely right, that the district court really should not have made any reference to the lateness of the plea to get the two levels. I recognize that's relevant maybe to whether you get an extra level. Well, I mean, I think that counsel is sort of parsing out the court's words and sort of misconstruing them. No, I think the court was quite clear in saying that one of several, it's not the only reason, but one of several reasons I'm offering here is that he basically waited until the last minute and put me and you through all of this hassle, and I'm counting that against him when I'm trying to decide whether he gets the two levels. And that's not proper, right? You concede that. That can't be the basis for denying it. I think if it has to do with your exercise of your constitutional rights, no, that's not proper. But if it has to do with an analysis of whether or not you were timely in making your plea, because the guidelines, and especially the 1987 guidelines, had a number of factors to consider, which included timeliness. You know, how timely were you when you came forward and admitted your guilt? And so, and I think what the court was referring to is we had actually, because it was so complex to put this case together and we had gotten to the eve of trial at least once, I had set a deadline about four months before the trial to resolve the case with the defendant. And not for the first time, because this had been going on for years, and that deadline came and went, and then only at the last minute and just over the period of time in the last few days, the defendant wanted to get rid of his counsel, he wanted to represent himself, then he didn't want to represent himself, and then he wanted to plead guilty. And so I think what the court was really referring to there was timeliness, not his exercise of his constitutional rights. Because there had been, you know, there had been attempts by the parties to resolve it, and tremendous resources had been put into getting it ready. And so the defendant's plea was not timely. And I think, so that was one of the many things the court said. And what the government had also said is we had been preparing, the most amazing thing about this case is that the people involved in it at the time, both his employees and the six cooperators that I prepped for trial three years ago, and many of the bankers, they were all in their early 30s at the time of the crime. So there we were 30 years later, preparing this case again, and these employees were devastated by having to sit there. And their cooperation was over, but they sat and they met with the government many, many times to prepare this case for trial, and they had been devastated and embarrassed when he left them behind. And all of the defendants were Filipino. He was considered a rock star in the Filipino community, and those are not my words. And he just devastated these people once again, because the Filipino press was writing about this. They had put it behind them 25 years before, and they were embarrassed because a lot of people they were now interacting with 25 years later didn't know about this. So the court's comments were not about the defendant's exercise of his constitutional rights. It was about whether or not he was timely in his guilty plea and the resources that had gone into preparing this case, because as I'm sure you could imagine, that was not an easy task, and we had been to the eve of trial once before, at least once before. All right. Thank you, counsel. Thank you. Your bow. I want to talk about other things as well, but to get to Your Honor's question about a case, I think a better case, actually. Cortez also tends to say it. United States v. Ochoa Gaitan, 265 F. 3rd, 837 at page 844. Is that in your brief? It is. I don't know for sure if that specific page site is, but that's the page. It says, because the factual question of whether Ochoa Gaitan has accepted responsibility should be decided in the first instance by the district court, we remand for resentencing. On remand, the district court should determine whether Ochoa Gaitan has shown contrition, et cetera. So I think that's the best I can give you, Your Honor, but I think that's pretty good. I want Your Honors, in both addressing the acceptance of responsibility question and what my opposing counsel just proffered, and the loss question, to keep one of the disadvantages of a trial counsel arguing the appeal is it's easy to start putting things out. I think much of what was said is not what was in the record before the district court. So please go back and look at the record. Much of what was just said about acceptance of responsibility, I think, is outside the record. I think very sincerely. The bottom line is the district court specifically listed three factors the way I count them, and two of those factors were improper under this court's case law. On loss, a couple points. I think opposing counsel was referring to a spreadsheet. I wasn't clear on whether she was saying there was a spreadsheet that had any evidence of causation in it. If she was, I sincerely believe there is not anything like that in the record, certainly not in the excerpt of record or government excerpt of record before the court. So please look back at those documents very carefully. There are these interview reports, but those were not what the district court relied on. Those were interview reports that were presented in a written opposition to a written motion in limine a year and a half before sentencing. They were not referred to at all at sentencing, either in the pleadings or the oral argument. The pleadings that the government filed were pleadings at document number 132 and document number 170 in the district court record. Those are in full, I believe in full, in the excerpt of record. And the district court, perhaps most importantly, I suppose the district court could have relied on something it remembered in interview reports from a year and a half early, and even those interview reports are not crystal clear about causation, but the district court said it was relying on, quote, and this is an excerpt of record 49, document number 132 and document number 170. It was not relying on whatever it might have been gleaned from these interview reports that were attached to an opposition to a motion in limine a year and a half earlier. What about, though, your opponent's argument that the fraud really did precipitate the bankruptcy? Well, that's the argument she's going to want to make at a remand on sentencing. The problem is it wasn't an argument that they presented evidence about at sentencing and it wasn't an argument the judge addressed at sentencing or ruled on at sentencing. And he – But surely the district court was aware of the facts that your opponent just laid out, which is that the bankruptcy was precipitated by Imperial's calling of the line of credit, and their decision to do that was because they had discovered this whole company was riddled with fraud. If he interpreted those interview reports the way the government wants him to. And he specifically said what he relied on, Your Honor. And this is why we know he wasn't looking at causation. He said he relied on document number 132 and document number 170. And those were the sentencing pleadings. And all those pleadings presented was evidence about the total bankruptcy loss, nothing at all about causation. Counsel, on the acceptance of responsibility, both Cortez and Ochoa Gaytan relied on the fact that the only reason given for the denial of acceptance of responsibility were those linked to the exercise of constitutional right. So, of course, we don't have that here. We have reasons other than the comments that you are relying upon. So do you have a case where there are other reasons given for the denial of acceptance of responsibility and there was a remand? I don't remember off the cuff, Your Honor. It may be one of the other cases. But I will point to the language I just read from Ochoa Gaytan, which says that it's in the first instance a question for the district court. Right. But the language that you didn't read is the district court may deny the reduction because of a lack of contrition. But it may not deny the reduction because of the choice to exercise constitutional right in spite of other manifestations of sincere contrition. So there was a condition on that, that language that you didn't read. Oh, there were other manifestations of contrition in this case. Well, the court did the – well, I'm not going to go back and forth with you about that. But my point is that the citation that you have to Ochoa Gaytan and U.S. Cortez don't mirror the facts of this case. Well, if I could just real quickly, Your Honor, there was other affirmative evidence of acceptance of responsibility here, not just what he said at sentencing, but probably most important, a trained probation officer who interviewed him for the probation report found in the interview that he, quote, continued to accept responsibility, unquote. That's in the PSR addendum. But the district court said the first time he expressed remorse was at the time of the sentencing. And also the district court said he pled on the eve of trial and tried to withdraw his guilty plea. So there were other things in the record. The point I'm making is that the cases that you cited, the district court only relied upon the fact of exercise of constitutional rights to deny the acceptance of responsibility, and that's not true in this case.  I'm not certain of that, Your Honor. Okay. All right. But I think there's other cases that say you can't consider something against the defendant as a factor. So I don't think that's true. All right. Thank you, counsel.  Thank you to both counsel for your helpful arguments in this case. The case just argued is submitted for decision by the court. The final case on calendar for argument today is United States v. J.D.T. Juvenile Mail.
judges: Wallace, Rawlinson, Watford